```
 1                  UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION

 3
                              - - - - -
 4
        TERESA READNOWER,         )
 5                                )
                Plaintiff,        )
 6                                )
                vs.               ) Civil Action
 7                                )
        GENERAL IONICS, INC.,     ) No. C-1-01-654
 8                                ) J. Weber
                Defendant.        )
 9
                              - - - - -
10
                   DEPOSITION OF JULIE SEGER
11
                              - - - - -
12
        REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
13      WITHOUT AUTHORIZATION FROM THE CERTIFYING
        AGENCY
14
                              - - - - -
15

16

17

18

19

20

21

22

23

24

25
```

1       T. Readnower - by Ms. Clark

2       Q.    It didn't apply?

3       A.    There was no conversation regarding
4   FMLA. It didn't apply to the conversation.
5   Ms. Readnower was not on FMLA leave at the
6   time.

7           (Seger's Exhibit No. 5 was marked
8   for identification.)

9       Q.    Ms. Seger, take the time you need,
10  if you would, to look this document over.

11      A.    Okay.

12      Q.    Could you turn to the paragraph
13  numbered 14, please.

14      A.    Okay.

15      Q.    Did you decide to terminate
16  Ms. Readnower's employment?

17      A.    I made a recommendation.

18      Q.    You made a recommendation to whom?

19      A.    To Marianne Manzon-Winsser,
20  coordinated with corporate counsel.

21      Q.    Can you explain to me why -- I'm a
22  little confused because I see here language to
23  the effect that I decided that Ms. Readnower's
24  behavior are the factors -- based on those
25  other factors, Ionics had no choice to

T. Readnower - by Ms. Clark

1  
2      terminate her employment and then down below,
3      this decision was made with the approval of
4      several people. Are you saying it was actually
5      just a recommendation?
6          A.    I don't have the opportunity to
7      terminate employees at Ionics, Incorporated.
8      That was handled at the corporate level. So it
9      was a recommendation, based on my understanding
10     of what was going on.
11         Q.    When you made the recommendation
12     to -- when you discussed this potential
13     termination with Marianne Manzon-Winsser and/or
14     Dave McKinley, was there any discussion about
15     whether you were proceeding under termination
16     for cause versus termination for performance
17     reasons?
18         A.    No. If you are asking specifically
19     related to the policy, no. I mean, the
20     discussion was about the termination and the
21     reasons for termination, but it wasn't
22     presented in the format of the category does
23     this apply to you.
24         Q.    Did anybody ask your opinion on
25     whether Ms. Readnower had received notice of

                                                                121

T. Readnower - by Ms. Clark

1  
2   Q.   Did this conversation occur -- was
3   this conversation relevant to your
4   recommendation to terminate Ms. Readnower?
5   A.   This conversation occurred, I
6   believe, because Jennifer was named as a
7   witness in an EEOC complaint, and it had not
8   been relevant before that, meaning we had no
9   reason to ask her any questions before that.
10  Q.   Was the conversation relevant to
11  your recommendation to recommend termination?
12  A.   The decision only in terms if she
13  had said something that was not in line with
14  everything else that someone -- if some major
15  revelation came out of the conversation, it
16  would have had an impact. The decision was
17  already made.
18  Q.   When was the decision made?
19  A.   The decision was made -- the
20  conversation happened some time, I believe, in
21  December, following the interviews with the
22  telemarketers between myself and legal counsel
23  and Marianne. It would have followed the
24  interviews with the telemarketers.
25  Q.   So the decision to terminate was

1         T. Readnower - by Ms. Clark

2 made in December?

3     A.    Yes.

4     Q.    Were there steps in the process

5 towards termination?

6     A.    Steps in terms of gathering all of

7 the information, presenting it, making a

8 determination what the next step would be if

9 there was a next step or if there was enough

10 information to make a decision, those steps.

11     Q.    Tell me what happened after the last

12 interview with the telemarketers?

13     A.    After interviewing the

14 telemarketers -- first of all, we knew that

15 telemarketers were suggesting that Teresa had

16 been involved in the incidents, the drinking

17 incidents prior to talking to the

18 telemarketers. That had come to light through

19 Dan. Talking to the telemarketers was to

20 verify that that was true, that telemarketers

21 were stating this about -- that the description

22 of the incidents were accurate. There was a

23 conversation with counsel prior to talking to

24 the telemarketers about, you know, we've got a

25 supervisor who is being said to have been in

T. Readnower - by Ms. Clark

this circumstance. This is totally not something that we support in the workplace. It is something that is, you know, obviously is a serious, serious issue for a supervisor to have participated in such things and written up her employees and denied knowledge of it to her supervisor, a serious issue, and that's where the telemarketing investigation came from. The conversations with the telemarketers were related to finding out whether that issue was true. So there was some conversation ahead of time about what do we do with this knowledge that we have of a couple of people who have said to Dan here's what happened. Teresa was involved, and the attorneys, we talked about it and said let's gather the additional information and just verify that it's true. So there was a discussion about the fact that there were grounds for termination in the performance of the supervisor, and consequently we did the investigation, found out additional information about morale in the workplace, about employees and how they were treated in the workplace, and so it was a follow-up

124

T. Readnower - by Ms. Clark

1  conversation then with the attorney that here's
2  what happened. Here's the information and
3  that's when the conversation took place,
4  following -- at some point following the
5  investigation with the telemarketers. Once the
6  information was gathered, it was submitted for
7  review.
8      Q.   When was the decision made? Was the
9  decision made to terminate before the first of
10 the year?
11     A.   Yes.
12     Q.   Were you privy to the conversation
13 in which that determination was made?
14     A.   It was based on my recommendation.
15 So what other conversations took place that
16 didn't include me, I don't know.
17     Q.   Did you ever hear reference to other
18 conversations that occurred outside of your
19 presence?
20     A.   Well, no. I mean, I don't know.
21 Corporate approved it. Corporate would have
22 discussed it with legal. I don't know exactly
23 what was discussed.
24     Q.   Did you think it was a serious issue

POWERS, GARRISON & HUGHES
Court Reporting & Video Services - Phone (412) 263-2088

** TOTAL PAGE.07 **