Service: Get by LEXSEE®
Citation: 163 F.Supp.2d 894

*163 F. Supp. 2d 894, \*; 2001 U.S. Dist. LEXIS 15209, \*\**

BECKY FARRA, Plaintiff, vs. GENERAL MOTORS CORP., Defendant.

Case No. C-3-98-66

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

163 F. Supp. 2d 894; 2001 U.S. Dist. LEXIS 15209

March 29, 2001, Decided

**DISPOSITION:** [\*\*1] Defendant's Motion (Doc. # 27) SUSTAINED. Defendant's Motions to Compel Production of Documents (Doc. # 18) and Order Compelling Plaintiff to Undergo Mental Examination, Pursuant to Fed. R. Civ. P. 35 (Doc. # 15), OVERRULED AS MOOT.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant employer moved for summary judgment in plaintiff employee's action alleging hostile work environment sexual harassment, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and state law.

**OVERVIEW:** An employee sued her employer alleging hostile work environment sexual harassment, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and Ohio Rev. Code Ann. § 4112, following alleged harassing and retaliatory conduct by her co-workers and employer. The employer moved for summary judgment, claiming that the employee failed to show that she was treated differently than males, that she failed to show that the alleged harassment was sufficiently severe, and that she failed to establish any adverse employment actions. The court granted summary judgment on the employee's sex discrimination and harassment claims, holding that she failed to demonstrate that the alleged harassment was based on her sex, or that the harassment was sufficiently severe or pervasive. The court additionally granted summary judgment on the employee's retaliation claims, holding that she failed to provide evidence that she suffered adverse employment actions by her employer.

**OUTCOME:** Summary judgment was granted.

**CORE TERMS:** drove, harassment, sexual harassment, cafeteria, walked, supervisor, retaliation, summary judgment, deposition, gesture, severe, lunch, sex, pervasive, genuine issue of material fact, diary, entitled to summary judgment, retaliatory, co-worker, parked, hearsay, sex discrimination, retaliated, staring, memorandum, coworker, hostile, protected activity, evidence submitted, prima facie case

### LexisNexis (TM) HEADNOTES - Core Concepts - ✦ Hide Concepts

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔍
*HN1*✦ Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN2* On a motion for summary judgment, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party who must set forth specific facts showing that there is a genuine issue for trial. Thus, once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN3* A party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed. R. Civ. P. 50). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to simply show that there is some metaphysical doubt as to the material facts. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN4* Fed. R. Civ. P. 56(e) requires the nonmoving party to go beyond the unverified pleadings and present some type of evidentiary material in support of its position. More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN5* See Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN6* Summary judgment shall be denied if there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits
Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN7* In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), a district court is not obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties. More Like This Headnote

Civil Procedure > Summary Judgment
Evidence > Hearsay Rule & Exceptions

*HN8* In general, hearsay may not be used to oppose a motion for summary judgment. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
*HN9* The McDonnell Douglas evidentiary framework is used for analyzing cases alleging workplace discrimination based on circumstantial evidence. Under the McDonnell Douglas burden-shifting principle, a plaintiff bears the burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination by demonstrating: (1) membership in the protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
*HN10* When interpreting Ohio Rev. Code Ann. § 4112, it is appropriate to look to analogous federal statutes, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
*HN11* Once the plaintiff establishes a prima facie case of workplace discrimination, an inference of discrimination arises. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. The plaintiff then assumes the final burden of proving that an employer's articulated nondiscriminatory reason for taking an adverse action towards her was unlawfully pretextual. She must prove that the employer's asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the employer's decision, that they were jointly insufficient to motivate the discharge. More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 
*HN12* In order for a plaintiff to establish a prima facie Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., claim of hostile environment sexual harassment by a coworker, she must demonstrate that the following elements of the statutory tort are present: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action. More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Other Laws 
*HN13* Ohio discrimination law depends on federal case law. An employer's liability in sexual harassment cases is governed by common law agency principles under the Restatement (Second) of Agency § 219(2). More Like This Headnote

Torts > Vicarious Liability > Agents 
*HN14* A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: (a) the master intended the conduct or the consequences, or (b) the master was negligent or reckless, or (c) the conduct violated a non-delegable duty of the master, or (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation. Restatement (Second) of Agency § 219(2) (1985). More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment

NOV 21 2003 17:09 FR                                    TO 13302525283          P.04/26
Get a Document - by Citation - 163 F. Supp. 2d 894                              Page 4 of 28
Case 2:03-cv-00294-HJW   Document 61-9   Filed 11/21/2003   Page 4 of 26

Torts > Vicarious Liability > Agents 🔍

*HN15*⊥ Employers may be held, subject to certain affirmative defenses, vicariously liable
in supervisor sexual harassment cases. But unlike a supervisor, a coworker does
not have power or authority emanating from the employer over the victim.
Therefore, the liability of the employer in coworker cases is governed the
Restatement (Second) of Agency § 219(2)(b). The victim of coworker sexual
harassment must therefore prove negligence by the employer. In coworker cases
the standard is based on a "reasonableness" standard: when an employer
responds to charges of coworker sexual harassment, the employer can be liable
only if its response manifests indifference or unreasonableness in light of the facts
the employer knew or should have known. Thus, a plaintiff must prove that the
employer knew or should have known of the charged sexual harassment and failed
unreasonably to take prompt and appropriate corrective
action. More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Coverage & Definitions 🔍

*HN16*⊥ To establish that the alleged harm was based on her sex, a plaintiff must show
that but for the fact of her sex, she would not have been the object of
harassment. Harassing behavior that is not sexually explicit but is directed at
women and motivated by discriminatory animus against women satisfies the
based on sex requirement. Conversely, harassment is not automatically
discrimination because of sex merely because the words used have sexual content
or connotations. More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 🔍

*HN17*⊥ In order to be actionable under Title VII of the Civil Rights Act of 1964 (Title VII),
42 U.S.C.S. § 2000e et seq., a sexually objectionable environment must be both
objectively and subjectively offensive, one that a reasonable person would find
hostile or abusive, and one that the victim in fact did perceive to be so. Conduct
that is not severe or pervasive enough to create an objectively hostile or abusive
work environment -- an environment that a reasonable person would find hostile
or abusive -- is beyond Title VII's purview. More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 🔍

*HN18*⊥ Simple teasing, offhand comments, and isolated incidents, unless extremely
serious, do not give rise to an actionable claim. This ensures that Title VII of the
Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., does not become
a code of civility for the workplace, censuring people for behavior that is merely
inappropriate. In determining whether the alleged harassment is sufficiently
severe or pervasive to constitute a hostile work environment under the Harris
standard, the court must consider the totality of circumstances. Among the factors
the court should consider in evaluating the pervasiveness of the alleged
harassment are: the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere offensive utterance;
and whether it unreasonably interferes with an employee's performance. Even
where individual instances of sexual harassment do not on their own create a
hostile environment, the accumulated effect of such incidents may result in a Title
VII violation. More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 🔍

*HN19*⊥ In some cases, the mere presence of an employee who has engaged in particularly
severe or pervasive harassment can create a hostile working
environment. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔗
HN20⊕ In order to establish a prima facie case of retaliation, a plaintiff must establish
that: (1) she was engaged in an activity protected by Title VII of the Civil Rights
Act of 1964, 42 U.S.C.S. § 2000e et seq.; (2) the exercise of the protected activity
was known by the defendant; (3) thereafter, the defendant took an adverse
employment action, or the plaintiff was subjected to severe and pervasive
retaliatory harassment by a supervisor; and (4) there was a causal connection
between the protected activity and the adverse employment
action. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔗
HN21⊕ Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to
the defendant to establish a legitimate, nondiscriminatory reason for the adverse
action. The plaintiff may rebut the legitimacy of defendant's articulated reason by
producing credible evidence that such a reason was a mere pretext for
discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔗
HN22⊕ On a retaliation claim, an adverse employment action typically must constitute a
materially adverse change in the terms of employment, such as termination of
employment, a demotion evidenced by a decrease in wage or salary, a less
distinguished title, a material loss of benefits, significantly diminished material
responsibilities, or other indices that might be unique to a particular
situation. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔗
HN23⊕ On a retaliation claim, an unfulfilled threat is insufficient, as a matter of law, to
constitute an adverse employment change. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔗
HN24⊕ Retaliatory harassment may be actionable as long as the adverse employment
action suffered is material. Therefore as with hostile environment sexual
harassment, retaliatory harassment by a supervisor that occurs prior to any
tangible employment decision must be severe or pervasive to be actionable. Under
certain circumstances, employers may also be liable for retaliatory harassment by
co-workers. An employer can be liable for co-workers' retaliatory harassment
where its supervisory or management personnel either (1) orchestrate the
harassment or (2) know about the harassment and acquiesce in it in such as
manner as to condone and encourage the co-workers'
actions. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔗
HN25⊕ Retaliatory harassment by a supervisor can be actionable under Title VII of the
Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. More Like This Headnote


**COUNSEL:** For Plaintiff: Deborah Adler, Mattew Stokely.

For Defendants: Matthew Lampe, Lori Clary.

**JUDGES:** WALTER HERBERT RICE, CHIEF JUDGE, UNITED STATES DISTRICT COURT.

**OPINIONBY:** WALTER HERBERT RICE

**OPINION: [*898]**

EXPANDED OPINION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 27); DEFENDANT'S MOTIONS TO COMPEL PRODUCTION OF DOCUMENTS (DOC. # 18) AND FOR AN ORDER COMPELLING PLAINTIFF TO UNDERGO MENTAL EXAMINATION, PURSUANT TO FED. R. CIV. P. 35 (DOC. # 15), OVERRULED AS MOOT; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

Since 1985, Plaintiff Becky Farra ("Farra") has been an employee of Defendant General Motors Corporation ("GM") at its assembly plant in Moraine, Ohio (Compl. P 4). She began experiencing difficulties at work, beginning in September, 1995, when she returned following a work-related injury. At that time, Plaintiff was assigned to a work station across from Rhonda Stanley Gibbs ("Stanley"), who [**2] was then engaged to, and is now married to, Mark Gibbs ("Gibbs"). In her Complaint, Plaintiff alleged that, since February, 1996, she has been subjected to repeated acts of sexual harassment and retaliation by Stanley, Gibbs, and various management representatives of Defendant, resulting in numerous adverse job actions (Compl. P 9).

In response to the alleged harassing and retaliatory conduct by her co-workers and GM, Farra filed charges of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC")(id. PP 5-6). She subsequently initiated this litigation (Doc. # 1), setting forth seven causes of action, to wit: (1) hostile work environment sexual harassment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) sex discrimination, in violation of Title VII; (3) retaliation, in violation of Title VII; (4) hostile work environment sexual harassment, in violation of Chapter 4112 of the Ohio Revised Code ("Chapter 4112"); (5) sex discrimination, in violation of Chapter 4112; (6) retaliation, in violation of Chapter 4112; and (7) a state law claim of intentional infliction of emotional distress. On November 30, 1998, Farra [**3] voluntarily dismissed, with prejudice, Count Seven of her Complaint (Doc. # 16).

Defendant sought summary Judgment on Plaintiff's remaining six claims (Doc. # 27). In addition, Defendant filed Motions to Compel Production of Documents (Doc. # 18) and for an Order Compelling Plaintiff to Undergo Mental Examination, Pursuant to Fed. R. Civ. P. 35 (Doc. # 15). On September 20, 1999 (Doc. # 43), the Court SUSTAINED Defendant's Motion for Summary Judgment (Doc. # 27) and OVERRULED, as moot, its other motions (Doc. # 15, Doc. # 18). The Court now sets forth its reasoning and citations of authority for that Opinion.

I. Factual Background n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The following facts are derived from the evidence submitted by the parties regarding Defendant's Motion for Summary Judgment (Doc. # 27). For purposes of that Motion, the Court will construe the facts and all reasonable inferences in a light most favorable to the Plaintiff, the non-moving party. In its substantive analysis, infra, the Court will recite additional pertinent facts, again construing those facts and all reasonable inferences most strongly in favor of Plaintiff.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**4]

In February, 1996, at the time that the events giving rise to this litigation began, Plaintiff worked on the door line in the trim department. Her work station was [*899] located across from Stanley. Gibbs, who at that time was Stanley's boyfriend, visited Stanley

NOV 21 2003 17:11 FR                    TO 13302525283        P.07/26
Get a Document by Citation - 169 F. Supp. 2d 894          Page 7 of 26
Case 1:04-cv-10981-MLW   Document 61-9   Filed 11/21/2003   Page 7 of 26

numerous times per day. These visits often involved "fights" between Stanley and Gibbs; the arguments did not involve Farra (Farra Dep. at 38). On February 14, 1996, Plaintiff commented to Stanley that Gibbs was not treating her properly (Id.). After lunch on that day, Farra returned to her work station, and discovered that her rivet gun was no longer working; she believed that Gibbs had sabotaged it (Id. at 38). Farra reported the incident to her supervisor, Charlie Smith ("Smith"), who approached Gibbs regarding that concern (id. at 39). The following day, after his discussion with Smith, Gibbs returned to Farra's work area, grabbed his crotch and said, "All you women can suck my dick. I've been here for twenty-five years and no mother fucker is going to run me off." n2 (Id.) In response to this comment, Plaintiff complained to management that Gibbs had sexually harassed her.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Defendant asserts that Gibbs' statement was limited to "suck my dick," and that it was directed to Smith, not Farra.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*5]**

Thereafter, Farra's relationship with Gibbs and Stanley rapidly deteriorated. In March, 1996, Stanley was "continually verbally abusing" Plaintiff (Farra Aff. at 2). On March 7, 1996, Gibbs allegedly drove up to Farra in his cart, jumped off of it, ran at her, then turned around, got back on his cart, and drove off (id.).

Beginning in April, 1996, Gibbs again began visiting Stanley on a regular basis, and Stanley and Gibbs continued to abuse Plaintiff verbally. That same month, Plaintiff's rivet gun began to spray water or oil. Plaintiff reported this to her supervisor. Farra believed that Gibbs had sabotaged her equipment, because he was "upset with her" (Farra Dep. at 179). Assistant Personnel Direct Rocky Jennings ("Jennings") and Gibbs' supervisor Mike Snyder ("Snyder") questioned Gibbs about the situation. Gibbs responded that the malfunction was due to a plant-wide problem and that he had been near Plaintiff's work area with his supervisor in an attempt to correct that problem. Gibbs was not disciplined.

Throughout the Spring and Summer of 1996, Plaintiff repeatedly requested that management stop Stanley's abuse and prevent Gibbs from coming near her (Farra Aff. at 3-4). **[\*\*6]** At some time during this period, Gibbs gestured in Plaintiff's presence by rubbing his crotch. n3 Labor relations representative Dan Krey ("Krey") told Plaintiff that she and Stanley needed to find a way to work together. In June, 1996, supervisor Leah Wolf ("Wolf") told Plaintiff to try to ignore Gibbs and Stanley, and just to do her job (Farra Aff. at 3). On August 27, 1996, a meeting was held between Plaintiff, Stanley, Wolf, labor relations representative Shawn Reynolds ("Reynolds"), Smith, and Union committeeman Steve Ward ("Ward") to discuss the work relationship between Stanley and Farra. Plaintiff and Stanley were informed that they needed to get along and do their jobs, or face disciplinary action (Farra Dep. at 183-84).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 In her deposition, Plaintiff states that Gibbs' gesturing began in the Spring of 1996. She did not specify how many times or on what specific dates the gesturing occurred. The first occurrence of Gibbs' gesturing that is noted in Plaintiff's affidavit was in February, 1997.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In September, **[\*\*7]** 1996, Plaintiff requested to be transferred to a different position, due

to the stress caused by Gibbs and Stanley arguing in front of her (Farra Dep. at 64; Farra Aff. at 4). From that month until early January, 1997, Farra worked in a variety of assignments, including **[*900]** the ones in the labor relations department, in final process, and in the trim department. In October, 1996, Plaintiff learned that her medical restrictions had expired. Her personal physician, Dr. Dunlap, resubmitted recommended restrictions, stating that she should not lift anything more than twenty pounds and that she should not lift, twist, bend, or rotate her torso (Farra Dep. at 80). On November 5, 1996, GM's physician, Dr. Rothstein, imposed restrictions, stating only that Plaintiff should not lift anything more than twenty pounds (Farra Dep. at 88-91; Rothstein Dep. at 61, Ex.)

On December 19, 1996, Farra injured her back while working in the doors off department (Farra Aff. at 6). She told her supervisor, Jeff Trick ("Trick"), that the position hurt her back, and she received a pass to the medical department. There, Farra was given a heating pad for her back for about twenty minutes. Afterwards, Dr. Rothstein, **[**8]** Wolfe, and Trick ordered her to return to work (id. at 6-7). When Farra protested the instruction that she return to her position, Trick place her on disciplinary notice for failing to return to her job. Thereafter, union representative Jim Marlow ("Marlow") arrived, arranged for the notice to be revoked, and took Plaintiff to Kettering Medical Center.

Farra returned to work on January 8, 1997. On January 10, 1997, she was assigned to the speaker job, across from Stanley. Between January, 1997, and May, 1997, Plaintiff continued to have problems with Stanley and Gibbs, and she continued to complain about them. In April, Stanley kept a fan, which faced Farra, turned on, causing Plaintiff to feel ill. Around that same time, Gibbs continued to make intermittent gestures, by grabbing his crotch in Plaintiff's presence. On May 5, 1997, Plaintiff was informed that she was being reassigned to C Crew (Farra Aff. at 10-11). Plaintiff did not come to work between May 5, 1997, and May 16, 1997, due to an ear ailment (Farra Dep. at 162). On May 16, Shawn Reynolds called her and told her to report to the final line A Crew the next morning (id. at 164). Farra never worked on C Crew.

In **[**9]** August, 1997, Stanley was transferred from the speaker job in the trim department. Beginning that same month, Stanley and Gibbs began eating together in the cafeteria (Farra Dep. at 150). Plaintiff complained to management about the presence of Stanley and Gibbs in the cafeteria while she ate lunch. On September 17, 1997, Farra had a meeting with Jennings and Krey. During that meeting, Plaintiff complained that Stanley and Gibbs were not staying away from her (id. at 152-53). Jennings questioned Plaintiff about why she had sat at a table in the cafeteria approximately ten feet from where Stanley and Gibbs were eating. Jennings allegedly stated that Farra had been "creating a lot of problems in [her] group," threatened to transfer her to the paint house, and stated that she could no longer have more committee calls "on this issue." (id. at 155).

Between September, 1997, and February, 1998, Gibbs repeatedly walked or drove by Farra's work station, and he and Stanley repeatedly ate in the cafeteria at the same time as Plaintiff. In February, 1998, Farra slipped on the ice in the parking lot, injuring her back. (Farra Dep. at 225-26). She has not worked since that time.

## II. **[**10]** Standard for Summary Judgment Motion

*HN1*Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the **[*901]** burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). *HN2*Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden [**11] then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby., Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)(quoting Fed. R. Civ. P. 56(e)). Thus, "once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that HN3 ✥a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed. R. Civ. P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical [**12] doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, HN4✥Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. HN5✥Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). HN6✥Summary judgment shall be denied "if there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) [**13] (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice [*902] and Procedure, § 2726. HN7✥In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir.), cert. [**14] denied, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ....") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. Defendant's Motion for Summary Judgment (Doc. # 27)

In its Motion, GM seeks summary judgment on Plaintiff's claims for sex discrimination, sexual harassment (hostile work environment), and retaliation. It contends that her sexual harassment claims must fail, because Gibbs' alleged wrongful conduct was not based on sex; Gibbs' alleged conduct was neither severe nor pervasive, such that it would constitute a viable claim; and because it took good faith, reasonable steps to address Plaintiff's complaints about sexual harassment. GM argues that her sex discrimination claims similarly must fail, because she cannot **[**15]** establish that she was treated differently than males. As for Plaintiff's retaliation claims, Defendant argues that she cannot establish a prima facie case of retaliation, because she cannot identify any adverse employment action that she suffered, and she cannot establish the necessary causal link between the alleged acts of retaliation and her protected activity. GM further argues that it had legitimate, non-retaliatory reasons for all of its actions regarding Farra, and she cannot demonstrate that such actions were pretexual. Plaintiff responds that there are genuine issues of material fact that preclude a grant of summary judgment, and that she can establish each of her claims. As discussed in this expanded Opinion, the Court concludes that Defendant's Motion has merit. Before addressing the arguments raised by Defendant's Motion, the Court will addresses two issues regarding the evidence submitted by Plaintiff.

A. Plaintiff's Evidence

After a thorough review of the memoranda and accompanying evidence submitted by the parties, two issues have presented themselves, namely Plaintiff's references to her evidence in her memorandum, and the incorporation of her diary **[**16]** into her affidavit. First, the Court notes that Plaintiff has failed in her obligation to identify particular evidence in the record to support her arguments. Plaintiff cites to her exhibits upon presenting her version of the factual background of this lawsuit. However, in her argument section, Plaintiff merely states, for example, that "she has introduced evidence" and that "she has presented evidence." Although she has attached twenty-four separately tabbed exhibits, the Court has found no citations in her memorandum indicating where, among those exhibits, any evidence in support of her various arguments is located. Presumably, **[*903]** Plaintiff has relied upon the Court to select from Plaintiff's voluminous record the appropriate facts and to cross-reference the factual background section of her memorandum to find the citations. Despite the Court's lack of duty to comb through the exhibits provided to find specific citations to support Plaintiff's arguments, Interroval Corp., supra, the Court has made a sincere and concerted effort to do so, in order to afford Plaintiff a complete and thorough review.

Second, the Court must address the admissibility of Plaintiff's **[**17]** affidavit, which incorporates a large excerpt of her diary. n4 In its Reply Memorandum (Doc. # 37), GM argues that the excerpts are inadmissible hearsay, and that the Court should not consider such statements as evidence. Although Plaintiff had no automatic right to file a sur-reply memorandum to address the attack on her affidavit, Plaintiff did not request leave to file a response to Defendant's contentions. Defendant's arguments, therefore, remain uncontested.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 Plaintiff's affidavit consists of twenty-one pages; beginning at the bottom of the first page, the statements contained in the affidavit consist of excerpts from her diary.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

NOV 21 2003 17:13 FR                                    TO 13302525283          P.11/26
Get a Document - by Citation - 162 F. Supp. 2d 894
Case 1:04-cv-00094-HJW   Document 61-9   Filed 11/21/2003   Page 11 of 26

Plaintiff has attempted to use her prior statements in her diary, which were not made at trial, to prove that certain events occurred and that certain statements were made. Fed. R. Evid. 801(c); see Ford v. Frame, 1994 U.S. Dist. LEXIS 9086, 1994 WL 323750 at *14 (E.D. Pa. June 28, 1994)(conclusory allegations in his complaint, deposition, and diaries were insufficient to create a genuine **[**18]** issue of material fact, because such evidentiary sources were inadmissible and hearsay); cf. Kokkinis v. Ivkovich, 10 F. Supp. 2d 995, 996 (N.D. Ill. 1998)(diary excerpts were admissible where they were used to prove the plaintiff's state of mind and not the truth of the statements). *HN8* In general, hearsay may not be used to oppose a motion for summary judgment. Wiley v. United States, 20 F.3d 222, 226 (6th Cir. 1994); Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999)("Hearsay evidence may not be considered on summary judgment."). However, Plaintiff has stated that she has personal knowledge of the events stated in her affidavit and, had Plaintiff opted to paraphrase those facts in that affidavit, they would not be deemed hearsay. The Court deems it obvious that many of the statements contained in the diary are based upon personal knowledge. Accordingly, the Court concludes that Plaintiff's affidavit, in general, is admissible. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 The Court notes that the diary entries included in Plaintiff's affidavit are replete with hearsay, even in light of Plaintiff's theory of admissibility. Plaintiff has offered no arguments to explain why those passages which contain hearsay satisfy a hearsay exception. Accordingly, where there is "hearsay within hearsay," i.e., statements that are not clearly based upon personal knowledge, the Court will ignore those passages.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**19]**

Furthermore, although Defendant objects to Plaintiff's incorporation of the diary excerpts, GM has waived that argument. Defendant has attached, as part of Exhibit B to its memorandum in support of its Motion for Summary Judgment (Doc. # 27), a number of the deposition exhibits that are referenced in the transcript excerpts. Included as Deposition Exhibit A are handwritten portions of Plaintiff's diary. In its memorandum (Doc. # 27), both in the factual background and in its analysis, Defendant references portions of that exhibit. Due to GM's use of Plaintiff's diary in its memorandum, the Court considers GM's hearsay argument to be waived. See Motor Club of America Ins. **[*904]** Co. v. Hanifi, 145 F.3d 170, 175 (4th Cir. 1998)(defendants' hearsay objection to plaintiffs' use of police report in their opposition to summary judgment was not well-taken where defendant had submitted that report to the court on three separate occasions with their motion for summary judgment); see also Skillsky v. Lucky Stores, Inc., 893 F.2d 1088, 1094 (9th Cir. 1990)("For purposes of summary judgment, the court had to consider the testimony, even if it was hearsay, because [defendant] **[**20]** failed to object.").

B. Sex Discrimination Claims

*HN9* The United States Supreme Court set forth an evidentiary framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), for analyzing cases alleging workplace discrimination based on circumstantial evidence. n6 Under the McDonnell Douglas burden-shifting principle, a plaintiff bears the burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination by demonstrating: (1) membership in the protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class. n7 See Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992)(citing McDonnell Douglas,

NOV 21 2003 17:13 FR                                    TO 13302525283        P.12/26

Get a Document - by Citation - 163 F. Supp. 2d 894 Case 1:01-cv-00091-HJW   Document 61-9   Filed 11/21/2003   Page 12 Page 26 of 28

411 U.S. at 802); Warfield v. Lebanon Correctional Inst., 181 F.3d 723, 728-29 (6th Cir.
1999).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Ohio courts have held that, [HN10] when interpreting Ohio Rev. Code Ch. 4112, it is
appropriate to look to analogous federal statutes, such as Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e, et seq. See Wooten v. Columbus, Div. of Water, 91 Ohio App. 3d
326, 334, 632 N.E.2d 605 (1993); Plumbers & Steamfitters Comm. v. Ohio Civil Rights
Comm'n, 66 Ohio St. 2d 192, 421 N.E.2d 128 (1981). Accordingly, the Court's analysis under
Title VII applies equally to Plaintiff's claims under Chapter 4112. [**21]


n7 Defendant does not dispute that Plaintiff is a member of the protected class (female), that
she suffered an adverse action, or that she is qualified for her position.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN11] Once the Plaintiff establishes a prima facie case, an inference of discrimination arises.
The burden of production then shifts to the employer to articulate a legitimate,
nondiscriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The Plaintiff
then assumes the final burden of proving that an employer's articulated nondiscriminatory
reason for taking an adverse action towards her was unlawfully pretextual. See Mitchell, 964
F.2d at 584, n.6. She must prove "that the [employer's] asserted reasons have no basis in
fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the
[employer's] decision, that they were jointly insufficient to motivate the discharge." Manzer
v. Diamond Shamrock Chem. Co., 29 F.3d 1078 (6th Cir. 1994); Burns v. City of Columbus,
91 F.3d 836, 844 (6th Cir. 1996).

GM argues that [**22] it is entitled to summary judgment on Plaintiff's sex discrimination
claims, because Farra cannot establish that she was treated differently than males. In her
deposition, Plaintiff testified that she believed GM discriminated against her based on her
sex, stating "I don't think they would have let this go this far if it would have been a male
complaining." (Doc. # 27, Ex. B at 55) However, she testified that this belief was "just [her]
opinion" (id. at 56), that she did not know of any men who had complained of harassment or
sexual harassment (id. at 55), and that she knew of no specific person who had been treated
better than she [*905] had been treated regarding complaints of harassment (id.). She did
not think that Defendant discriminated against her, because of her sex, in any other way (id.
at 56).

In response to GM's argument, Plaintiff merely states: "Farra has presented evidence from
which a reasonable jury could decide that Defendant proceeded as it did and discriminated
against her on account of her gender. Therefore, summary judgment is inappropriate." (Doc.
# 36 at 33) Plaintiff has not cited to any specific evidence to refute Defendant's evidence that
her [**23] sex discrimination claim is based solely on her opinion that men would be
treated differently. After a thorough review of the evidence submitted by Plaintiff, the Court
has found no evidence to suggest that Defendant's conduct in addressing her claims of
harassment was based on her sex, that similarly-situated men existed, or that such men had
been or would have been treated differently. Thus, Plaintiff has not demonstrated that a
genuine issue of material fact exists regarding her sex discrimination claims. Defendant has
demonstrated that it is entitled to judgment, as a matter of law, on those claims.
Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's sex discrimination
claims is SUSTAINED.

NOV 21 2003 17:13 FR                                    TO 13302525283        P.13/26
Get a Document - by Citation - 163 F. Supp. 2d 894
Case 1:01-cv-00594-HJW  Document 61-9    Filed 11/21/2003    Page 13 of 26

## C. Sexual Harassment Claims

In Fenton v. HiSAN, Inc., 174 F.3d 827 (6th Cir. 1999), the Sixth Circuit set forth the elements of a prima facie case for a hostile work environment sexual harassment claims based on the conduct of a coworker. It stated:

> Based upon Blankenship and the Supreme Court's opinion in Ellerth, we conclude that **HN12**⌖In order for a plaintiff to establish a prima facie Title VII claim of hostile environment sexual harassment **[\*\*24]** by a coworker, she must demonstrate that the following elements of the statutory tort are present: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action.

Fenton, 174 F.3d at 830; Courtney v. Landair Transport, Inc., 227 F.3d 559, 565 (6th Cir. 2000). GM asserts that Plaintiff cannot establish the third, fourth, and fifth n8 elements of hostile environment sexual **[\*906]** harassment claim. As discussed below, the Court concludes that Plaintiff has not demonstrated that she can establish a prima facie case of sexual harassment. In particular, she has not demonstrated that the alleged harassment was based on her sex, or that the harassment was severe or pervasive.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 Plaintiff asserts that Blankenship was overruled by the Supreme Court decision in Faragher. As noted by Defendant and the Sixth Circuit, the Supreme Court's recent decisions (Faragher and Burlington Industries) have addressed employer liability when the sexual harassment has been conducted by a supervisor. In Fenton, the Sixth Circuit explained the basis for employer liability when a co-worker has engaged in sexually harassing conduct, contrasting the standard for such liability with the standard for employer liability when a supervisor's conduct is at issue. In doing so, it reaffirmed Blankenship, stating:

> **HN13**⌖Ohio discrimination law depends on federal case law. In Burlington Industries v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998), the Supreme Court again held that an employer's liability in sexual harassment cases is governed by common law agency principles and specifically adopted section 219(2) of the Restatement (Second) of Agency as setting out the governing principles:
>
> > **HN14**⌖
> > "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
> > (a) the master intended the conduct or the consequences, or
> > (b) the master was negligent or reckless, or
> > (c) the conduct violated a non-delegable duty of the master, or
> > (d) the servant purported to act or to speak on behalf of the principal

and

there was reliance upon apparent authority, or he was aided in accomplishing the
tort by the existence of the agency relation."


Restatement (Second) of Agency § 219(2) (1985) (emphases added).

In Ellerth, the Supreme Court concluded that subsection (d) --and specifically the last clause
thereof ("or he was aided in accomplishing the tort by the existence of the agency relation") -
- applies in supervisor harassment cases and therefore does not require a showing of
negligence or reckless conduct under subsection (b) in order to bring the case within the
supervisor's "scope of employment." Hence the Court concluded that *HN15*employers may
be held, subject to certain affirmative defenses, vicariously liable in supervisor sexual
harassment cases. But under the Supreme Court's reasoning in Ellerth, unlike a supervisor[,]
a coworker does not have power or authority emanating from the employer over the victim.
Therefore since the "master" does not normally intend or abet the coworker's conduct
(subsection (a)) or have a nondelegable duty to prevent it in all circumstances (subsection
(c)), the liability of the employer in coworker cases is governed by subsection (b) of section
219(2) of the Restatement (Second) of Agency. The victim of coworker sexual harassment
must therefore prove negligence by the employer. This standard is consistent with the
negligence standard we have previously employed in coworker harassment cases. In
Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 872-73 (6th Cir. 1997), cert. denied,
522 U.S. 1110, 118 S. Ct. 1039, 140 L. Ed. 2d 105 (1998), we stated that in coworker cases
the standard is based on a "reasonableness" standard: "when an employer responds to
charges of coworker sexual harassment, the employer can be liable only if its response
manifests indifference or unreasonableness in light of the facts the employer knew or should
have known."

Fenton, 174 F.3d at 829-30 (emphasis in original)(internal citations omitted). Thus, a plaintiff
must prove that the employer knew or should have known of the charged sexual harassment
and failed unreasonably to take prompt and appropriate corrective action. Id. at 830; see
Blankenship, 123 F.3d at 873 ("When an employer implements a remedy, it can be liable for
sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to
indicate an attitude of permissiveness that amounts to discrimination."). Because the Court
concludes that Plaintiff has not established that Gibbs' actions were based on sex or that the
alleged sexual harassment was severe or pervasive, the Court need not address whether GM
has met this standard.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**25]

1. Based on Sex

*HN16*To establish that the harm was "based on her sex," Farra "must show that but for the
fact of her sex, she would not have been the object of harassment." Williams v. General
Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999), quoting Henson v. City of Dundee, 682 F.2d
897, 904 (11th Cir. 1982). "Harassing behavior that is not sexually explicit but is directed at
women and motivated by discriminatory animus against women satisfies the 'based on sex'
requirement." Id. Conversely, the Supreme Court has stated that harassment is not
"automatically discrimination because of sex merely because the words used have sexual
content or connotations." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 140 L. Ed.
2d 201, 118 S. Ct. 998 (1998); Richmond-Hopes v. City of Cleveland, 1998 U.S. App. LEXIS

29572, 1998 WL 909222 (6th Cir. Nov. 16, 1998).

GM argues that Gibbs' statements and gestures toward Farra were based on Plaintiff's comments to Stanley about her relationship with Gibbs, and not due to an animus against women. Plaintiff's deposition testimony substantiates GM's argument. Plaintiff testified:

> **[*907]** A. Well, I was **[**26]** working with Rhonda and her and Mark were arguing and fighting all the time and it was very stressful to me. And one day I said to her out of concern for her, isn't he smothering you, because he spent a lot of time there at our job and them arguing, I asked her isn't he smothering you? And I said, he calls himself your boyfriend and he treats you like that. And she told him at break time what I said and then I discussed that with my supervisor because I went to lunch and come back and my rivet gun was tore apart... [Gibbs] had been giving me dirty looks when he came back after she said that to him and then, like I said, the rivet gun was tore apart and I discussed that with my supervisor the next day and I told him that I couldn't -- you know, I couldn't handle their unhappy relationship while I was trying to work because it was very stressful on me, and he took Mark to the side and told Mark to stay away.

> \* \* \* \* \*

> A. Mark came back after Charlie [Smith, Plaintiff's supervisor] told him to stay away and he grabbed his crotch and he said all you women can suck my dick. I've been here for twenty-five years and no motherfucker is going to run me off.

> Q. You understood **[**27]** that he was mad that you had reported him to his supervisor?

> A. Yes.

> Q. Is that your understanding?

> A. I understand that.

> \* \* \* \* \*

> Q. Was it your understanding that he was upset with you for getting involved in his relationship with Rhonda?

> A. Yes.

> \* \* \* \* \*

> Q. And from that point forward the trouble with Mark Gibbs started?

> A. Yes.

Doc. # 27, Ex. B at 38-41) Thus, Plaintiff's deposition testimony regarding his conduct on February 15, 1996, indicates that she understood that his statement and crotch-grabbing gesture was made out of anger for her comment to Stanley about him and for her reporting of him to her supervisor.

In response to the evidence cited by Defendant, Plaintiff argues that Gibbs rubbed his

genitals in her presence and that he made a comment on the night of August 20, 1996,
indicating that his prior remark ("suck my dick") had a sexual element. She further argues
that there is no evidence that Gibbs made such comments or gestures to male employees
and, thus, a jury could infer that the conduct was based on her sex.

Plaintiff's evidence regarding Gibbs' additional conduct does not create a genuine issue of
material fact **[\*\*28]** regarding whether his conduct was based on her gender. In her
deposition, Plaintiff testified that he made crotch-grabbing gestures toward her on
approximately ten occasions (Doc. # 27, Ex. B at 43-52; Doc. # 36, Ex. D at 47). This
conduct occurred between March or April of 1996 and September, 1996; between January,
1997, and May, 1997; and one occasion after May, 1997, all of which followed his comment
and crotch-grabbing gesture of February 15, 1996, and during which times Plaintiff was
working near Gibbs' then-fiancee, Stanley (Id.). The affidavit of Jim Marlow, which Plaintiff
submitted in support of her argument, indicated that Plaintiff understood that Gibbs'
gesturing was merely a continued manifestation of his anger. Mr. Marlow stated, "I received
several reports from Farra that both Gibbs and Stanley had numerous confrontations with
Farra over the course of **[\*908]** the next several months, apparently in retaliation for Farra
complaining to the labor relations department." (Marlow Aff. P 3). Thus, viewing the evidence
in the light most favorable to her, as this Court is constrained to do, Plaintiff has not provided
evidence to support a reasonable inference that Gibbs' subsequent **[\*\*29]** gestures and
comment were made because Plaintiff is female. Rather, the evidence submitted by both
parties indicates that Gibbs' conduct was due to personal animosity. Accordingly, Defendant
is entitled to summary judgment on this basis.

2. Severe or Pervasive Harassment

Even if there were a genuine issue of material fact as to whether the alleged sexual
harassment were based on Plaintiff's sex, Plaintiff has not demonstrated that the unlawful
conduct was severe or pervasive. The Supreme Court has stated that, *HN17*"In order to be
actionable under [Title VII], a sexually objectionable environment must be both objectively
and subjectively offensive, one that a reasonable person would find hostile or abusive, and
one that the victim in fact did perceive to be so. n9 Faragher v. City of Boca Raton, 524 U.S.
775, 787, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998); Harris v. Forklift Systems, 510 U.S.
17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295. "Conduct that is not severe or pervasive
enough to create an objectively hostile or abusive work environment -- an environment that
a reasonable person would find hostile or abusive -- is beyond Title VII's purview." Harris v.
Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993), **[\*\*30]** citing
Meritor Savings Bank v. Vincent, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986).
*HN18*Simple teasing, offhand comments, and isolated incidents, unless extremely serious,
do not give rise to an actionable claim. Faragher, 524 U.S. at 788. This ensures that Title VII
does not become a code of civility for the workplace, censuring people for behavior that is
merely inappropriate. Id. "In determining whether the alleged harassment is sufficiently
severe or pervasive to constitute a hostile work environment under the Harris standard, it is
well-established that the court must consider the totality of circumstances." Williams, 187
F.3d at 562. Among the factors that the Court should consider in evaluating the
pervasiveness of the alleged harassment are: the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive utterance;
and whether it unreasonably interferes with an employee's performance. Harris, 510 U.S. at
23. "Even where individual instances of sexual harassment do not on their own create a
hostile environment, the accumulated **[\*\*31]** effect of such incidents may result in a Title
VII violation." 187 F.3d at 563.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n9 Based on the evidence submitted by Plaintiff, the Court has no doubt that she subjectively

NOV 21 2003 17:15 FR                                      TO 13302525283      P.17/26
Get a Document - by Citation - 162 F. Supp. 2d 894
Case 1:01-cv-00094-HJW   F. Supp. Document 61-9   Filed 11/21/2003   Page 17 of 26   Page 17 of 28

found Gibbs' conduct to be offensive.

- - - - - - - - - - - - - End Footnotes - - - - - - - - - - - - - - -

GM asserts that Plaintiff's claim is based on eleven instances of harassing conduct. (See Farra Dep. at 52, in which she states that, other than Gibbs' one statement and his approximately ten gestures, he did not engage in any other sexual harassing behavior). Plaintiff responds that the harassment was continuous, unreasonably offensive, and affected her ability to do her job. In support of her argument, Farra cites to: 1) Gibbs' statement on February 14, 1996; 2) that he drove his cart at her on March 7, 1996; 3) that Gibbs kept coming around her work area throughout 1996, 1997, and 1998; 4) his ten crotch-grabbing gestures **[\*909]** in 1996 and 1997; 5) dirty and intimidating looks; and 6) verbal harassment.

According to her affidavit, Farra states that, on March, 7, 1996, Gibbs "drove up[,] jumped off his **[\*\*32]** cart[,] ran at me, stopped[,] got on his cart[,] and drove off." (Farra Aff. at 2). During the following year and a half, n10 Gibbs grabbed his crotch in Plaintiff's presence approximately ten times n11 (Farra Dep. at 43-52). Plaintiff cites to six specific instances, between February, 1996, and January, 1998, when Gibbs stared at her, n12 and only one instance, in April of 1996, where Gibbs verbally harassed her. n13 None of the alleged conduct involved any physical contact between Plaintiff and Gibbs, and the alleged gestures and looks occurred roughly sixteen times over a twenty month period. Assuming that such conduct constituted sexual harassment, it is not severe and pervasive, as a matter of law. See, e.g., Baskerville v. Culligan Internat'l Co., 50 F.3d 428, 430 (7th Cir. 1995)(nine allegedly unlawful incidents, spread over seven months, could not reasonably be thought to constitute sexual harassment)(cited with approval by Black v. Zaring Homes, Inc., 104 F.3d 822 (6th Cir. 1997)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 As stated, supra, Plaintiff testified that these gestures occurred between March or April of 1996 and September, 1996; between January, 1997, and May, 1997; and one occasion after May, 1997. **[\*\*33]**

n11 Plaintiff cites to the deposition of Shannon Maxwell, in which Ms. Maxwell described these gestures as "adjusting himself" (Maxwell Dep. at 117). Ms. Maxwell stated that Gibbs "would just grab himself is what he would do. Like he was, what I say, situating himself in a funny way." (Id. at 82) Maxwell further testified that she never saw Gibbs make eye contact with Plaintiff when she observed him having his hand on his crotch, and that she did not perceive it as a gesture toward Plaintiff (id. at 82, 117).

n12 According to her affidavit, Gibbs gave her intimidating looks on five occasions, to wit: August 23, 1997 (Gibbs "had his arms crossed and looks that could kill."); October 15, 1997 (staring); October 22, 1997 (staring); November 25, 1997 (staring); January 9, 1998 (staring). In her deposition, she also states that Gibbs had intimated her by looking at her on February 15-16, 1996. (Farra Dep. at 45).

n13 See Farra Aff. at April, 1996 ("[Mark] and Rhonda would talk about me and make fun of me.").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In addition to the above conduct, Plaintiff argues that there were **[\*\*34]** numerous instances of Gibbs coming near to her while at work. n14 Shannon Maxwell, a co-worker of Plaintiff, confirms that Gibbs was at the door line area every day between March and May of 1997 (Doc. # 36, Ex. J at 33). However, of the approximately forty instances between April, 1996, and January, 1998, when Plaintiff states that Gibbs came near to her, there is no evidence that he engaged in any harassing conduct, other than the staring and gesturing already mentioned above.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n14 See Appendix A for a list of the approximately forty instances when Gibbs came near to Plaintiff, according to her affidavit.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

A number of courts of appeal have stated that, *HN19*"in some cases[,] the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment." Ellison v. Brady, 924 F.2d 872, 883 (9th Cir. 1991); Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998); Cortes v. Maxus Exploration Co., 977 F.2d 195, 199 (5th Cir. 1992); **[\*\*35]** Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718 (3d Cir. 1997). Herein, however, there is no evidence that Gibbs' harassment was particularly severe. To the contrary, virtually all of his alleged offending conduct consisted of intermittent gestures and unwelcome staring. Thus, Gibbs' mere presence does **[\*910]** not constitute continued acts of sexual harassment. Viewing the totality of the circumstances, Gibbs' ten gestures, his six stares, his statement of February, 1996, and his conduct of March 7, 1996, all of which occurred over an approximately two year period, are insufficient, as a matter of law, to constitute severe and pervasive harassment. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's claims of sexual harassment is SUSTAINED. n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 In the fact section of her memorandum, Plaintiff discusses numerous incidents of alleged harassment perpetrated by Stanley. In particular, she states that Stanley constantly gave her dirty looks, that she gave dirty looks to other co-workers who were friendly toward her, that Stanley verbally harassed her, and that she turned on the fan in their work area for hours when Farra wanted it off. However, Plaintiff has not alleged that Stanley's conduct constituted sexual harassment, and there is no evidence that her conduct was based on Plaintiff's sex rather than a personal conflict. Therefore, the Court did not consider such conduct to be evidence of sexual harassment, and it did not consider Stanley's conduct in determining whether the alleged sexual harassment was severe or pervasive.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*36]**

D. Retaliation Claims

*HN20*In order to establish a prima facie case of retaliation, Farra must establish that: (1) she was engaged in an activity protected by Title VII; (2) the exercise of the protected activity was known by the defendant; (3) thereafter, the defendant took an adverse employment action, or the plaintiff was subjected to severe and pervasive retaliatory

harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Ct., 201 F.3d 784 (6th Cir. 2000); Fenton, 174 F.3d at 831; Barnett v. Department of Veterans Affairs, 153 F.3d 338, 343 (6th Cir. 1998), cert. denied, 119 S. Ct. 875 (1999). [HN21] Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse action. See EEOC v. Avery Dennison Corp., 104 F.3d 858, 862 (6th Cir. 1997); Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., 783 F.2d 50, 54 (6th Cir. 1986). The plaintiff may rebut the legitimacy of defendant's [**37] articulated reason by producing "credible evidence" that such a reason was a mere pretext for discrimination. See Jackson, 783 F.2d at 54.

In her Opposition Memorandum (Doc. # 36), Plaintiff cites a myriad of ways that Defendant has retaliated against her. In particular, she states that GM's acts of retaliation include the following:

(1) allowing the actions of Gibbs & Stanley in creating and perpetuating personal hostility and animosity.

(2) placing her in jobs that violated her medical restrictions.

(3) threatening her with a transfer to the paint department if she continued to complain.

(4) violating her seniority rights through her proposed transfer to the final line C crew position in May, 1997.

(5) failing to produce her permanent personnel file.

(6) promising to do an investigation after appearance at Conference Board meeting and failing to do so.

(7) placing her back on line across from Rhonda knowing all the problems that would cause.

(8) not taking appropriate measures to prevent Gibbs and Stanley from continuing to take action in her work area.

(9) failing to discipline Gibbs or Stanley under appropriate [**38] shop rules. [*911]

(10) not letting her have committeeman present in meeting.

(11) forcing her to return to work on 12/96 despite back problems.

(12) placing pressure on corroborating witness Shannon Maxwell by asking her father, who was a GM management official, to get Shannon to stay out of the situation.

(13) creating false stories about Farra's alleged romantic interests in Marlow and Gibbs in the draft response to Farra's letter to Defendant's CEO.

(Doc. # 36 at 33-34) In her memorandum (Doc. # 36), Plaintiff only addresses the alleged retaliatory harassment by her co-workers. However, in the interest of completeness, the Court will address all thirteen of the alleged instances of retaliation listed by Plaintiff.

HN22⊕An adverse employment action typically must constitute "a materially adverse change in the terms of ... employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885-86 (6th Cir. 1996) [**39] (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). Assuming, without deciding, that Farra can establish that she engaged in a protected activity and that GM knew of that activity, Plaintiff has not provided evidence that she suffered an "adverse employment action," or that there was a causal connection between the protected activity and the alleged adverse employment actions. Thus, as discussed below, Plaintiff has not created a genuine issue of material fact that she suffered retaliation by Defendant.

First, Plaintiff has not presented evidence that GM retaliated against her on September 17, 1997, when Jennings threatened to transfer her to the "paint house." Farra has provided no evidence that Jennings' threat was consummated, i.e., that she was, in fact, transferred. Even assuming that a transfer to a position in the "paint house" would constitute a material adverse change in her terms of employment, HN23⊕an unfulfilled threat is insufficient, as a matter of law, to constitute such an adverse change. Hollins v. Atlantic Co., Inc., 188 F.3d 652 (6th Cir. 1999)(threat to discharge or transfer was not an adverse [**40] employment action under Title VII, when there was no evidence that plaintiff's foreman had the authority to fire or transfer her, and "the alleged threat merely stated the possibility of transfer or discharge"); see also Helgeson v. American Internat'l Group, Inc., 44 F. Supp. 2d 1091, 1098 (S.D. Cal. 1999)("A mere threat of termination, however, is not an adverse employment action. It had no effect on the terms, conditions or duration of employment."); Meckenberg v. New York City Off-Track Betting, 42 F. Supp. 2d 359, 381 n.13 (S.D.N.Y. 1999)(threat to withhold vacation days not an adverse employment action when vacation days were never, in fact, withheld). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of retaliation based on Jennings' unrealized threat, on September 17, 1997, to transfer her.

Second, Plaintiff likewise did not experience any demotion, change of title, change in rate of pay, or change in benefits when GM reassigned her to the final line C Crew. Assuming that GM's anticipated transfer of Plaintiff to the C Crew position occurred in retaliation for her complaints and that the position would constitute [**41] a material adverse change in the [*912] terms of her employment, Plaintiff never actually suffered any adverse action. She filed a grievance with labor relations and was off work for a few days following that planned transfer. When she returned to work, she had been returned to A Crew, and she never actually had to work in the transferred position. Thus, although threatened, Plaintiff never suffered adverse consequences. See Richmond-Hopes, supra (plaintiff never experienced the adverse consequences of reassignment, because the defendant remedied the problem immediately). Defendant is also entitled to summary judgment on this claim.

Third, Plaintiff has no provided evidence that she suffered an adverse employment action when she was instructed to return to work, on December 19, 1996, despite complaining of back problems. As with the threatened transfer to C Crew, the undisputed evidence indicates that any adverse action was immediately rectified. As Plaintiff states in her affidavit:

... In about 20 minutes [Bridgett, the nurse] came back in the room, took the heat off [my back] and told me I had to go back to work. I told her to get me my union guy that [**42] I couldn't go back to work, my back was killing me. In about 5 minutes, in came Dr. Rothstein, Leah [Wolf] and Jeff Trick. The Dr. said to me "Becky get up and go back to work." I said I cannot go back to work my back is killing me. She said "there is nothing wrong with your back get up and go back to work."... The whole time this was happening, Jeff Trick was in my face

yelling at me to go back to my job. Yelling and threatening me. He then said you
are on notice and possibly discharged for not going back and doing your job. At
that time a union man (Alan Anderson) stood in front of me and said nobody is
going to say anything else to you... I was in severe pain, humiliated, and upset. I
told them that I wanted to go to the hospital. Marlow [union representative] said
that he wanted to get it straitened [sic] out about me being on notice before I
left the building. I guess they worked that out...

(Farra Aff. at 7) In his affidavit, Jim Marlow confirmed that he "intervened in the matter and
successfully convinced Trick to withdraw the notice of discipline. He then took Farra to the
hospital emergency room for treatment." (Marlow Aff. P 5) Plaintiff's evidence, therefore,
 **[**43]** indicates that, even if Defendant attempted to retaliate against her when it initially
ordered her to return to work, the situation was immediately rectified, i.e., she was not
forced to return to work and the notice of discipline was revoked. Thus, Plaintiff has not
provided evidence that she suffered an adverse employment action on December 17, 1997.
See Richmond-Hopes, supra. Accordingly, Defendant is entitled to summary judgment on this
retaliation claim.

Fourth, even assuming that Defendant placed Plaintiff in positions that violated the medical
restrictions suggested by her personal physician, n16 those transfers likewise do not
constitute an adverse employment action, because Defendant remedied her complaints that
the positions hurt her back. Defendant has provided undisputed evidence that Plaintiff was
immediately removed from positions that caused her back pain, and that they repeatedly
attempted to reassign her to positions that would not cause her physical problems. In her
deposition, Plaintiff cites numerous instances where Defendant responded **[*913]** to her
complaints about a position hurting her back. After requesting being removed from the trim
department **[**44]** in September, 1996, Plaintiff was placed in final process, a job which
Plaintiff liked (Farra Dep. at 63-66). In October, 1996, she was transferred to the motor line
(id. at 70). That job required Farra to "pull on a thing up over my head," which hurt her back
(id.). She states, however, that she complained to her supervisor, Dave Parks, and that after
she had complained, she was moved to front end sheet metal (id.). Plaintiff worked in that
position for two days, while the person who normally performed that job was not there (id. at
71). After the front end sheet metal position, Plaintiff worked for a couple days in the paint
house, putting tape on the doors and on the tailgate. She also liked that position (id.).
Following that position, Farra was placed on the chassis line (id. at 72). After a few hours,
she complained that it hurt her back. As a result, she was sent to medical department (id.).
Although the medical department told her to return to work, Plaintiff testified that she was
sent home by union representatives before she returned her post (id. at 73). When she
returned to work again, she told Dan Krey that the job was hurting her back ( **[**45]** id. at
74). In response, Farra was temporarily placed in labor relations, a job which did not hurt her
back, "until they could figure out what they could do with me." (id. at 73-75). In November,
1996, she was assigned to the trim department, putting luggage racks on trucks (id. at 75-
76). After her back began to hurt, Farra complained to her supervisor, Debbie, and went to
medical department (id. at 76). After she returned to the trim department, Debbie put her on
a different job, the clip job (id.).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n16 There is no evidence that the positions in which Plaintiff was placed violated the medical
restrictions imposed by GM's physician.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Around December 13, 1996, Plaintiff worked the doors off position in the trim department. n17 Plaintiff complained to her supervisor, Denny Long, that the job was hurting her, and she went to the medical department (id. at 83). Plaintiff was told to return to work; however, after she discussed with Wolf, Trick, and Paul Stanley her need to go home and to see **[**46]** her physician, she was permitted to do so (id. at 84-85, 97). On December 19, 1996, when Farra injured her back, she again went to the medical department. Although, she was originally ordered to return to her job, Plaintiff was ultimately was taken to the hospital, and did not have to return to that position. Plaintiff, therefore, has not provided evidence that Defendant's conduct with regard to her job placement was "adverse." To the contrary, Plaintiff's deposition testimony indicates that, numerous times, Defendant attempted to ensure that Plaintiff was in a position that did not aggravate her back condition and permitted her to go home when she was injured. Thus, Plaintiff has not provided evidence to create a genuine issue of material fact that Defendant's placement of her in positions that might have violated her medical restrictions constituted an "adverse employment action."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n17 As indicated, supra, Plaintiff asserts that GM retaliated against her by placing her in positions that violated her medical restrictions. In her deposition, Plaintiff stated, "I know of the date that I -- that the doctors put me on -- it was around December 13th, somewhere around that date that they were-- they put me on a job a couple different times that was not within my restrictions that I kept hurting my back on." (Farra Dep. at 79) The Court, therefore, presumes that Plaintiff is arguing that GM retaliated in her by placing her in the position she held around December 13, 1996.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**47]**

In addition, even if transferring Plaintiff to positions that violated her personal physician's suggested medical restrictions constituted adverse employment actions, there is no evidence of a causal connection between **[*914]** those actions and her protected activity. Although Plaintiff states that she told Dr. Rothstein of her problem with co-workers, there is no evidence that she informed Dr. Rothstein that she was sexually harassed or that she complained to management of sexual harassment. (See Dunlap Dep. at 93, stating that Dr. Rothstein told him that Farra had complained about "a problem with a male and female employee who knew each other or something, and there was friction between those two and Ms. Farra.") Furthermore, there is no evidence that Dr. Rothstein was informed by GM management that Farra had filed complaints regarding sexual harassment, or that management directed its physician to disregard Dr. Dunlap's recommendation that Plaintiff not lift, bend, twist or rotate her torso. Because there is no evidence that Dr. Rothstein was aware of sexual harassment complaints, there is no evidence from which a reasonable juror could infer that Dr. Rothstein's failure to implement **[**48]** Dr. Dunlap's recommended restrictions was in response to Plaintiff engaging in a protected activity. In addition, there is no evidence that the positions in which Plaintiff was placed violated the restrictions set by Dr. Rothstein. Accordingly, Defendant is entitled to summary judgment on this retaliation claim.

Fifth, with regard to Plaintiff's allegations that GM retaliated against her by permitting continued harassment, Plaintiff has not demonstrated that she can establish that claim. n18 The claim of retaliatory harassment by co-workers was recently discussed by the Sixth Circuit:

HN24⟱Retaliatory harassment may be actionable as long as the adverse employment action suffered is material. Therefore as with hostile environment sexual harassment, retaliatory harassment by a supervisor that occurs prior to any tangible employment decision must be severe or pervasive to be actionable. Other Circuits have recently confirmed that under certain circumstances, employers may also be liable for retaliatory harassment by co-workers. The Tenth Circuit held in Gunnell v. Utah Valley State College, 152 F.3d 1253, that an employer can be liable for co-workers' retaliatory harassment where its supervisory **[\*\*49]** or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such as manner as to condone and encourage the co-workers' actions.

Richmond-Hopes, at \*9 (internal citations omitted). n19

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n18 In her list of GM's acts of retaliation, Plaintiff states that Defendant retaliated against her by the acts of Gibbs and Stanley (item 1), by placing her back across from Stanley (item 7), by not taking appropriate measures to prevent Gibbs and Stanley from continuing to take action (item 8), and failing to discipline Gibbs or Stanley (item 9). Because these allegations all concern retaliatory harassment by Gibbs and Stanley, they will be addressed together.

n19 The Sixth Circuit recently held that  HN25⟱retaliatory harassment by a supervisor can be actionable under Title VII. Morris, supra. Because Farra has alleged retaliatory harassment by a co-worker, rather than a supervisor, the standard set forth in Morris is inapplicable to the present lawsuit..

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*50]**

Farra asserts that GM management failed to stop the harassment of Stanley and Gibbs in retaliation for her continued complaints. However, Plaintiff has not provided any evidence that Stanley's and Gibbs' conduct was orchestrated by GM management. In addition, even assuming that the harassment continued, she has not provided evidence that GM "condoned and encouraged" the behavior. To the contrary, **[\*915]** Plaintiff acknowledges that "Wolf instructed Farra and Stanley that they needed to be able to work together and that any further problems would result in possible discipline." (Doc. # 36 at 11) She further provided evidence that Gibbs was repeatedly instructed to stay away from Plaintiff and not to go near to her work station unless necessary (e.g., Krey Dep. at 156). For example, Plaintiff's diary entry of April 23, 1997, stated that she "begged Shawn to do something about Mark (rubbing on himself)"; the entry for the next day states that "Mark was told to stay away . . ." (Farra Aff. at 9) Viewing the evidence in the light most favorable to Plaintiff, n20 as this Court is constrained to do, the conduct of Defendant does not rise to the level of encouraging or condoning harassing behavior **[\*\*51]** by Gibbs or Stanley. Thus, summary judgment in favor of GM is appropriate on this claim.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 Although the Court has not cited to all of the actions taken by Defendant regarding Plaintiff's continued complaints, the Court has made a thorough review of the evidence

submitted.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Sixth, GM's failure to produce her permanent personnel file is not an adverse employment action. Although Farra may be entitled to a copy of those documents under the collective bargaining agreement, there is no evidence that the conditions of her employment were affected by GM's failure to produce the file. Defendant is entitled to summary judgment as to this allegation.

Seventh, Plaintiff alleges that GM retaliated against her when it denied her a committeeman. n21 Although not specified, Plaintiff presumably is referring to the statement by Jennings, during the September 17, 1997, meeting that she would not be entitled to "more committee calls on this issue." (Farra Dep. at 155) However, as with Jennings' other threat at that meeting, **[**52]** Farra testified in her deposition that neither Rocky Jennings, nor anyone else, after that meeting, denied her a committeeman call (Farra Dep. at 157). Thus, Plaintiff has not provided evidence that she suffered a material adverse consequence. Accordingly, GM is entitled to summary judgment on this claim.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n21 A committee call is the right, under the collective bargaining agreement, to have a union representative present with the employee. (Farra Dep. at 157)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Eighth, Plaintiff asserts that GM retaliated against her by failing to send individuals from Detroit to perform an investigation of her complaints. The only evidence with regard to this allegation is the affidavit testimony of union representative Marlow. He stated: "The conference board chairman, Nick Nichols, persuaded Farra not to make the presentation at the conference board meeting. he advised her that management in Detroit was aware of the situation and had requested her not to make a presentation at the board meeting, and that they would be sending **[**53]** someone from Detroit to do an investigation. Thus, Farra did not make the presentation." (Marlow Aff. P 19) Assuming that such a promise was made, Plaintiff has provided no evidence that GM failed to investigate. Even assuming that no investigation were performed, Plaintiff has not indicated, or provided evidence as to, what adverse employment action she suffered as a result of any failure to investigate in August, 1997, by Detroit personnel, in light of the evidence that her complaints were not ignored by management at the Moraine plant. Furthermore, she has not provided evidence that there was any causal connection between her complaints of sexual harassment and the alleged failure to investigate. Accordingly, Plaintiff has not established that GM retaliated against her **[*916]** by failing to send persons from Detroit to investigate her complaints.

Ninth, Farra has not established that she suffered retaliation when GM allegedly placed pressure on her corroborating witness, Shannon Maxwell, by asking her father, who was a GM management official, to convince Shannon to stay out of the situation. In her deposition, Ms. Maxwell testified that her father stated that he did not want her to **[**54]** get involved in Plaintiff's complaints, because he "was upset due to the fact that there [were] a lot of people [who were] going to him asking him questions." (Maxwell Dep. at 93-94). Even if the Court were to infer that Defendant were pressuring Ms. Maxwell, there is no evidence that such conduct constituted an adverse employment action toward Farra. Defendant is entitled to summary judgment on this claim.

NOV 21 2003 17:18 FR                    TO 13302525283        P.25/26
Get a Document by Citation 163 F. Supp. 2d 894                    Page 25 of 26
Case 1:01-cv-00084-HJW   Document 61-9   Filed 11/21/2003   Page 25 of 26

Finally, Plaintiff cannot establish that GM retaliated against her by creating false stories about her alleged romantic interests in Marlow and Gibbs in its draft response to Farra's letter to Defendant's CEO. There is no evidence that the draft was disseminated, or that it affected her employment any way. Defendant is entitled to summary judgment on this claim.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's claims of retaliation is SUSTAINED.

For the foregoing reasons, Defendant is entitled to summary judgment on Plaintiff's claims of sex discrimination, hostile work environment sexual harassment, and retaliation. Defendant's Motion (Doc. # 27) is SUSTAINED. Defendant's Motions to Compel Production of Documents (Doc. # 18) and for an Order Compelling **[**55]** Plaintiff to Undergo Mental Examination, Pursuant to Fed. R. Civ. P. 35 (Doc. # 15), are OVERRULED AS MOOT.

Judgment will be entered in favor of the Defendant and against the Plaintiff.

WHEREFORE, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

March 29, 2001

WALTER HERBERT RICE, CHIEF JUDGE

UNITED STATES DISTRICT COURT

APPENDIX A

INSTANCES WHEN GIBBS CAME NEAR TO PLAINTIFF

1. March, 1996 ("Mark started coming back around a little here and there.")

2. April, 1996 ("Mark started coming back around on a daily basis.")

3. May, 1996 ("Mark was still hanging around on a daily basis.")

4. June, 1996 ("Mark still coming around and Rhonda's abuse continued and my begging management to keep Mark away and Rhonda's mouth off of me continued.")

5. September, 1996 ("...that didn't stop Mark because he came down to my break area everyday and ate breakfast. He just wouldn't stay away from me.")

6. January 11, 1997 ("Went in about 5:00. About 5:05, Mark was there. Stayed until 7:00 -- left and came back at 7:18 breach and stayed till **[**56]** 8:15. He came back off and on all day. He makes me feel uncomfortable.")

7. February, 1997 ("Rhonda's running her mouth. Starts pretty heavy again and Mark's hanging in my face all day. Sitting there rubbing on himself. He's sick and so is she. I complained over and over about him being there. Didn't do any good.")

8. March, 1997 ("Rhonda's verbal abuse continues. Mark still continues.")
   **[*917]**
9. April 23, 1997 ("I begged Shawn to do something about Mark (rubbing on himself).")

10. April 24, 1997 ("Mark was told to stay away except for breaks and lunch, but he was there from 7:00 until 8:15 and 11:20 until 12:25.")

11. May 5, 1997 ("It started with Rhonda and Mark fighting in my face again... Mark kept coming and going all day sitting there rubbing on himself. Shannon [Maxwell] has also seen him several times... Last break, Mark was there...")

12. August 13, 1997 ("Mark and Rhonda sat and stared at me in the cafeteria.")

13. August 23, 1997 ("Mark driving by and sitting in the cafeteria by himself at lunch time. Had his arms crossed and looks that could kill. Couldn't help seeing him, he was sitting right at the door.")

14. September 8, 1997 ("[Rhonda] **[\*\*57]** and Mark were in the cafeteria at lunch.")

15. September 9, 1997 ("[Rhonda] and Mark were in the cafeteria at lunch.")

16. September 10, 1997 ("Mark crossed over by Charlie's office before lunch and after. They were both in the cafeteria. They were both in the hallway when I started back to my job.")

17. September 11, 1997 ("Both in the cafeteria and the hallway again.")

18. September 17, 1997 ("11:30 Mark drove by my job, parked by Charlie's office and walked across the track. Went to lunch and him and Rhonda in the lunch room. 12:10 he walked back by again. He drove by several times today."

19. September 18, 1997 ("Mark drove by 11:25, parked by Charlie's office, and walked by. This is an everyday thing now. He and Rhonda in the lunch room again (everyday).)

20. September 19, 1997 ("Mark drove right up by my job and used the phone at Charlie's desk about 15 feet from me at 11:40, then went to the cafeteria... Mark walked back by 12:20.")

21. September 20, 1997 ("Mark drove by and walked through at 11:35. They were in the cafeteria sitting with Ted Sowders... Mark walked back through at 12:15. He drove by at 12:40 and again at 1:48.)

22. September 24, 1997 ("At **[\*\*58]** 9:15, Mark drove right up to me at the stop sign. I just kept on walking.")

23. September 25, 1997 ("Mark drove by at 6:45. They weren't in the lunch room again, but they drove by together at 12:20 and again at 12:30. Then Mark again at 1:30...")

24. October 1, 1997 ("I thought after last week, Mark and Rhonda weren't going to be around, but Mark drove by at 6:45, 11:25, and again at 2:30. They were both in the cafeteria again today.")

25. October 3, 1997 ("Mark drove by at 11:36, parked, and walked by the office. He also drove by at 2:20 and 3:35. They were both in the cafeteria. Mark also walked by at 12:20.")

26. October 6, 1997 ("Mark drove by 11:25, parked and walked by. Walked back by 12:10. They were both in the cafeteria at lunch and the hallway after lunch. Mark drove by 1:30.")

27. October 15, 1997 ("Mark drove by 6:35. At 7:15, he stood in the hallway by the cafeteria staring at me. He drove back by 11:30, parked walked **[\*918]** by, and went to the cafeteria. Both in the cafeteria at lunch and both in the hallway. He walked back by at 12:20. Drove back by at 1:30 break.")