UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TERESA READNOWER | : | Case No. C-1-01-654 |
| | : | J. Weber |
| Plaintiff, | : | |
| | : | |
| vs. | : | **AFFIDAVIT OF CHARLOTTE RAY** |
| | : | |
| GENERAL IONICS, INC. | : | |
| | : | |
| Defendant. | : | |

State of Ohio      )
                   ) SS
County of Hamilton )

I, Charlotte Ray, being first duly cautioned and sworn, do aver as follows:

1. My name is Charlotte Ray. I have personal knowledge about the events described herein and am competent to testify about them.

I. **Background**

2. I am a current employee of General Ionics ("GI") and am presently on medical leave. I am a sales representative.

3. I am also a divorced mother who has at all relevant times been a primary breadwinner for myself and my two daughters.

4. When I began employment at GI, Darryl Brandenberg ("Mr. Brandenberg") was the General Manager and Daniel Goins ("Mr. Goins") was Unit Manager and then Assistant General Manager. When Mr. Brandenberg left GI employment, Mr. Goins became General Manager.

5. At GI, the telemarketers in the telephone room make telemarketing calls that in turn generate "leads." Sales representatives like myself follow up on these "leads" by makes sales calls to individuals who indicate interest in our product. Sales representatives therefore take

strong of interest in the performance of the telephone room.

6. In my observation, the performance of the telephone room under Teresa Readnower ("Ms. Readnower") was at all times exemplary. I never knew how she accomplished the high number of leads generated by the telephone room, but I was always pleased with the performance of the telephone room.

7. I was present on many occasions when Ms. Readnower received commendations and accolades for the number of "leads" generated by the telephone room. Generating a high number of leads is obviously critical to GI's success.

8. In his roles as Unit Manager and Assistant General Manager, Mr. Goins had the task of assigning these "leads" to sales representatives who would follow up and make the appropriate sales call.

9. As a sales representative, I have a strong desire to obtain not only a large number of "leads," but also so-called good "leads." Good "leads" are those most likely to lead to a sale. As a sales person, good "leads" are very desirable because they allow me to more easily reach my sales goal.

## II. First Complaint of Sexually Harassing Behavior by Mr. Goins

10. In the early 1990s, Mr. Goins told me several times that I should date his friends and explained, "You haven't had anything until you've had black meat. It's the best." I assumed that Mr. Goins (who is African-American) referred to "black meat" in reference to his African-American friends. He further threatened that if I did not do so, he would "starve" me, i.e., assign me the most undesirable sales "leads."

11. I complained to Mr. Brandenberg. Mr. Goins approached me in anger, having learned of my complaint, and again threatened to "starve" me. I believe that he did retaliate by assigning me undesirable sales "leads." I nonetheless managed to generate a large number of

2

sales.

12. On other occasions after this complaint, he displayed sexually inappropriate hand gestures while at work.

13. He also repeatedly asked me, "What would it be like if I woke up in bed with your daughter?" (or words to that effect.) He asked me this question on multiple occasions in reference to each of my two daughters.

### III. Forced Retraction of a Complaint of Sexual Harassment

14. In October, 1997, I called in for my "leads," and Mr. Goins kept me waiting on the telephone for over 30 minutes. He finally assigned me a "lead" half-way across town and in which the customer was expecting me very shortly. Though I was ready to leave immediately for the appointment, it was impossible to arrive on time given the timing of my assignment. I explained my problem to him and as promised, I did in fact make the sales call. However, I was unhappy at being forced to be tardy as it offends my own work ethic and, as I have learned from experience, makes the customer angry and/or unwilling to buy the product.

15. Mr. Goins in turn accused me of being insubordinate.

16. A few days later we both met with Darrell Brandenberg to discuss the situation. I requested the right to have a third party present but was denied this opportunity.

17. This meeting lasted approximately two hours. During the meeting, I informed Mr. Brandenberg about Mr. Goins' comments about my daughters (described above).

18. In response, Mr. Goins demanded that I be fired. He stated to Mr. Brandenberg, "Either she goes, or I go." Mr. Brandenberg informed me that if I did not retract my allegation of sexual harassment, I would be fired.

19. In fear of losing my job, I signed a retraction.

20. I am also aware that Daniel Goins made a sexual advance on another sales

representative named Lisa Hamilton in which he requested to touch her breasts. It was my understanding that she complained to Darrell Brandenberg about this advance. She left the company shortly thereafter.

IV. **Mr. Goins Ridicules and Makes Sexually Suggestive Comments About Ms. Readnower from 1998 to 2000**

21. In the course of my job, I attended twice weekly sales meetings with Mr. Goins and other sales representatives. Ms. Readnower generally did not attend those meetings.

22. During these meetings (when Ms. Readnower was not present), Mr. Goins stated repeatedly that he believed that Teresa would be a "fantastic lay" (or words to that effect). I recall him stating that she was blonde and skinny and pretty and that he wanted to "get in her pants." These comments occurred at least four or five times between 1998 and 2000.

23. During these meetings, I also recall Daniel Goins making fun of Teresa because she was clearly upset on the job. He noted on at least one occasion that she was stupid and he had her riled up.

24. I made note of these comments because I was very surprised and disappointed that a GI manager would display such blatant disrespect for a GI employee. I was especially surprised as I always observed that Ms. Readnower did a very fine job.

Further Affiant Sayeth Naught.

_____
Charlotte Ray

Sworn to and subscribed before me on this 27th day of December, 2002.

_____
Notary Public

SUSAN M. HARTUNG
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 06-17-06

4